CHIEF JUSTICE PETERS
delivered the opinion of the court:
These three appeals are prosecuted on the same record. The two first named involve nearly the same questions. They were all heard together, and will now be decided in the order in which they here stand.
H. T. Curd, a resident of the city of Louisville, died there in February, 1859, intestate. He was then, and had been previous thereto, engaged in speculations of *329 various kinds, requiring large sums of money, and in order to raise the requisite amounts, Curd in very many, if not in all cases, drew bills or drafts which he procured others to accept, and to meet these bills he consigned to the acceptors, who were generally commission merchants, or persons engaged in commercial transactions, produce, manufactured articles, &c.
A. M. Gazley, to whom administration on Curd’s estate was granted, upon an examination of his financial condition, ascertained that the assets, both real and personal, were insufficient to pay the debts ; and for the purpose of settling the estate instituted this action in equity.
In the fall of 1858, Curd, in partnership with one Gainey, engaged in speculating in hogs, and Curd also engaged in the same enterprise, on his own individual responsibility; and in order to raise the requisite means to purchase hogs, both Curd and Gainey, as partners; and Curd individually, made an agreement to the following effect, with the firm of Martin, Cobb & Co., as stated by said firm in their answer herein: Bills were to be drawn by the parties, respectively payable on the times and at the places agreed upon, which were to be accepted by Martin, Cobb & Co. The products of the hogs purchased with the money thus raised were to be under the control of, and be sold by, said firm, and when sold, the proceeds to be applied to the payment of said bills, with the costs and charges; and if the proceeds were insufficient, the parties respectively were to pay the deficit.
It was further agreed between the parties, that the hogs were all to be slaughtered and packed by D. Ricketts & Co., a firm in which said Martin, one of the firm of Martin, Cobb & Co., as they allege, was interested, and for which he desired to secure business. They were slaughter *330 ed and packed by said firm of D. Ricketts & Co., as a separate firm from Martin, Cobb & Co., and with the bill of charges for slaughtering and packing the last named firm professes to have no connection. That D. Ricketts, who is a member of the firm of D. Ricketts & Co., is not a member of the firm of Martin, Cobb & Co., and that two of the members of this firm are not members of that of D. Ricketts & Co., and that although some of the members of the one are also members of the other firm, still they are different and distinct companies, doing business at different places, and engaged in different operations.
That Martin, Cobb & Co.’s place of business is in New Orleans, Louisiana, where the rate of interest allowed by law is greater than that allowed in Kentucky, but is the same as charged in their account current exhibited with their answer, and is the same that the drawers of the drafts promised to pay when they accepted them.
. It is alleged that, after the hogs were slaughtered and packed by D. Ricketts & Co., their products were delivered to Martin, Cobb & Co., by whom they were ultimately sold, but only a small portion thereof was sold prior to the death of Curd, which occurred on the 24th of February, 1859; and that the drafts which had been accepted for Gainey & Curd and for Curd, matured the 8th of March, 1859, and were paid at maturity by the acceptors; that the proceeds of the sales of the products of the hogs were insufficient to pay the amount of said drafts and the costs and charges for slaughtering, packing, selling, &c., leaving a balance in favor of each of said firms, both against Gainey & Curd, and also against Curd individually, for which judgments are asked against Curd’s personal representative; and if the assets should prove insufficient to pay the full amount of these de *331 mands, they ask that they may be paid pro rata with the other creditors.
Alleging that they never had any debts or' demands against Curd, either individually or as partner of Gainey, except those growing out of their dealings with him in reference to said hogs ; and that, until it was ascertained by an actual sale of their products that the funds arising therefrom were insufficient to pay them, neither Curd & Gainey, nor Curd, were under any obligations to pay them anything, and until a deficit was thus ascertained there was no indebtedness; and when that transpired, there was no property in their possession, and none anywhere upon which there could be a lien.
This position was controverted by the administrator, who insisted that, at the death of his intestate, these parties held a large amount of his property, upon which they had Iona fide liens for their indemnity to a very great extent, if not to the full amount of their liabilities; and that the residue of intestate’s estate is inadequate to pay the creditors who have no liens a pro ratd on their debts equal to that realized by appellants on their debts and liabilities out of the effects of intestate held by them, and that they were not entitled under section 34, chapter 37, Revised Statutes, 1 volume, 509, to any part of said residue, until the creditors without liens shall have received the same proportion of their debts that appellants had received on their demands.
The chancellor decided that they were, according to the letter and spirit of the statute, lien creditors, and should be postponed until the other class of creditors were paid ratably with them; and from that judgment they have appealed.
The first ground relied upon for reversal is, that appellants were not creditors of the intestate while they held *332 the products of the hogs, and never were until these products were all sold and delivered, and the sums realized from the sales proved insufficient to pay them, and then there was nothing in their possession to which a lien could attach, or which they could retain; consequently, they could not have a lien.
In note to. American Leading Cases, volume 1, page 73, it is said: “As to rights from contract, any one liable upon a contract, express or implied, though only contingently, is a debtor from the time that the liability is entered into; accordingly, a surety is the creditor of the obligor or co-surety, from the time the obligation is entered into.” And sureties are regarded as creditors in this State to the extent, that, by express enactment, they may avail themselves of all the provisional remedies that are provided for creditors against their debtors. (Sec. 730, C. C.)
Appellants were, from the time they accepted the bills of Curd, and Gainey & Curd, contingently their creditors; and the contingency transpired before they parted with the effects of their principals, by which they became in fact their creditors. They allege in their answer that the bills matured the 8th of March, 1859, and were paid by them at matui’ity; they were then certainly the creditors of their principals, with the right to dispose of the effects in their hands for the satisfaction of this indebtedness ; and the exhibit or account current filed by them with their answer shows that a large amount of the products — indeed much the larger portion of them — were sold after the 8th of March, 1859. We do not now decide, nor is it necessary in this case to decide, the question that an accommodation acceptor of a bill or indorser of a note is the creditor of his principal; but after the bill or note matures, and the acceptor or indorser pays the debt, he then is certainly the creditor of his princi *333 pal; and that was done in this case. And having the goods of their principals in possession, they had a right to dispose of them to satisfy their demands, which, according to the most approved definition, made them creditors with a lien.
' Wherefore, the judgment against Martin, Cobb & Co., before referred to, is affirmed.
And the judgment complained of by D. Ricketts & Co., for the same and additional reasons, is also affirmed.
As to the appeal of the administrator against Mrs. Curd, it does not appear from the proof, that, when her father gave her the money with which slaves were to be purchased, that he either intended or required that the title should be secured to her, or that they should be held in trust for her separate use. Wm. Edmonds, the father of Mrs. Curd, was asked to whom, at the the time of H. T. Curd’s death, did the slaves, naming them, belong? and he answered, “ I considered said negroes as belonging to Haiden T. Curd, as the head of the family, except the boy James, of whom I know nothing.” And in answer to the next interrogatory, he states, he gave to his daughter, Mrs. Curd, in August, 1830, $1,000, to be laid out in negroes for her and “ the xise of the family.” The slaves were purchased by the husband, taken into his possession, and remained under his control until his death; and it may be assumed that he was dealt with, and obtained credit on the faith that they were his. The title was not in any way secured to the wife; she had neither a separate estate or the use of the slaves secured to her. We do not perceive, therefore, upon what principle her claim to the slaves can be sustained. But her right to the note for upwards of one thousand dollars, given to her by her father on decedent, stands upon different and more favorable grounds. *334 That note was given to her. She retained it in her own possession, and held it as the evidence of a debt due her in her own right; frequently demanded payment; and her claim to it as separate estate was always recognized by her husband; and that it was so intended by the donor is indicated by the indorsement on the note, and equity will regard the transaction and carry it out according to the true intent of the parties. She is therefore entitled to the same rights and privileges of other creditors to the extent of this note.
According to the construction heretofore put upon the statute, Mrs. Curd was entitled to one third of the rents of the real estate of the husband, and to retain the mansion house until dower was assigned her. Consequently, the $447 70 were properly allowed her as an additional credit, and her claim to the brick and corn-crusher properly rejected.
Wherefore, the judgment is reversed on the original appeal of the administrator, and affirmed on the cross-appeal of Mrs. Curd, and the cause remanded, with directions for further proceedings consistent herewith.